GRAGG et al. v. PRUITT et al.

No. 23764. Dec. 22, 1936.

Dissenting Opinion Dec. 29, 1936.

Rehearing Denied March 9, 1937.

N. A. Gibson, W. A. Barnett, R. M. Cavanaugh, and Norvell & Norvell, for plaintiffs in error.

W. L. Seawell, for Pearl A. Dovell.

A. M. Beets, William J. Zeman, and Banks, O'Brien & McVey, for defendant in error Freelin Pruitt.

WELCH, J. This is an appeal from the district court of Seminole county. The parties on appeal occupy positions the reverse to that occupied in the trial court, and will be referred to as plaintiff and defendants, as they appeared in the lower court.

The plaintiff, a minor, by his guardian, brought suit to declare a resulting trust in a certain oil and gas lease executed by a former guardian, and for an accounting of the proceeds derived therefrom. The lease covered an undivided 1/6 interest belonging to the plaintiff in and to 120 acres of land in Seminole county. Several of the original defendants have died during the pendency of this litigation, and various other defendants have been substituted in their stead.

Upon trial of the cause to the court, judgment was rendered in favor of plaintiff, declaring that the lease was held by the defendants in trust for the plaintiff. The judgment also required an accounting by the defendants as prayed in plaintiff's petition. Certain of the defendants have appealed.

The facts necessary to an understanding of the issues here are substantially as follows: A short time prior to May 26, 1927, one of the original defendants, an attorney, Mr. Orwig, met in conference with defendants Gragg and Dovell, and it was agreed between them that a guardian's sale of an oil and gas lease would be "put through" covering the minor's interest in the land involved, the remaining portions of the title being owned by adults. The defendant Orwig, as plaintiff's witness, testified in relation thereto as follows:

"Q. Was it not agreed at that time that the sale would be put through and one of them would purchase it and it would be the joint property of all of you? A. No, sir; it wasn't agreed that I would have any interest in it and they didn't definitely agree to buy it, but they were interested in it and expected the lease to be put up for sale and if it was cheap enough they would buy it. The reason for the sale was to get the lease in the name of some adult person so it could be leased for drilling."

Some time after this agreement, and on May 26, 1927, the said guardian, represented by Orwig as his attorney, filed a petition in the county court of Seminole county, and on the same day procured an order of the county court authorizing the guardian at public sale to sell an oil and gas lease covering the minor's interest in the land involved. Upon the sale date none of the persons who had participated in the conference above mentioned appeared to buy the lease, whereupon Orwig procured one Norvell to purchase the lease at a bid of $1,000. Such sale was confirmed to Norvell in regular order, and the oil and gas lease was duly executed and delivered thereunder, but no part of the consideration was then paid.

Some 60 days thereafter, Norvell, upon Orwig's request, executed a conveyance of a one-half interest in the lease to the defendant Graham. Prior to that time the $1,000 representing the purchase price of the lease had not been paid to the guardian. At that time, however, it appears that Graham furnished $500 and Orwig furnished $500, which was paid to the guardian through Norvell, as the consideration for the lease. The record fairly shows that Graham then knew the manner in which the guardianship sale had been handled up to that

time, and the trial court so found. Title to the remaining one-half interest in the lease remained in Norvell until January 17, 1928, when, at the request and direction of Orwig, he assigned the same to one of the defendants, Gragg. Norvell never at any time claimed an interest in the lease, purchasing same only at the request of Orwig, and paying for same only with money furnished by Graham and Orwig some 60 days after the confirmation of sale. Norvell at all times held the title subject to the directions of Orwig. He conveyed the remaining one-half interest to Gragg after he had received several thousand dollars in proceeds from the lease, and upon his suggestion to Orwig that he did not desire title to remain longer in his name, since payments were being received from oil companies which had developed the property.

The uncontradicted evidence shows, and it is not contended otherwise, that the guardian was not informed and never had knowledge from any source that sale of the guardian's lease was made to Norvell, as trustee, for the use and benefit of Orwig or any other person.

The judgment of the trial court contains the following findings of fact:

"The court further finds that heretofore, to wit: On or about the 1st day of June, 1927, the sale of an oil and gas lease was made through the county court of Seminole county, covering the interest of the plaintiff in the above-described lands; that in said sale the defendant S. S. Orwig acted as attorney for the guardian of the plaintiff and that said oil and gas lease was purchased by Spencer Norvell or R. S. Norvell for the use and benefit of the defendant S. S. Orwig.

"The court further finds that the said oil and gas lease brought its full market value at the time it was sold and that there was no fraud in said sale; the court further finds that at the time of said sale the said S. S. Orwig acted in the utmost good faith, with no intention on his part to cheat, wrong, or defraud this plaintiff, but that he was the purchaser at said sale and did not make a full and complete disclosure to his client of all the material facts concerning said sale.

"The court further finds that the defendant S. S. Orwig in all other respects gave the plaintiff and his guardian the same full, complete, and fair advice that he would have given had the sale been made to a stranger, except to advise the guardian or the plaintiff that he, S. S. Orwig, was the purchaser.

"The court further finds that since the institution of this suit, A. E. Graham and Gordon Dovell have both died and that same

has been duly and legally revived in the name of Mrs. Alice B. Graham, administratrix of the estate of A. E. Graham, deceased, and Mary Lou Graham, a Stanaert Graham and Mrs. Alice B. Graham, who are all the heirs of A. E. Graham, deceased; and Mrs. Pearl A. Dovell, administratrix of the estate of Gordon Dovell, Daisy Loree Dovell and Pearl A. Dovell, who are the heirs and all the heirs of Gordon Dovell, deceased.

"The court further finds that neither A. E. Graham, C. E. Gragg nor Gordon Dovell were innocent purchasers of the interest they purchased in the leasehold estate herein referred to, but that they purchased same with full knowledge of the fact that the same had been purchased by Spencer Norvell for the use and benefit of and as trustee for S. S. Orwig, and that S. S. Orwig acted as the attorney for the guardian in putting through the guardianship sale of the oil and gas lease through the county court.

"The court further finds that the plaintiff is entitled to an accounting against the defendants and to a judgment against the defendants and each of them, except the defendant S. S. Orwig, for such sum or sums of money as it shall develop in the accounting to be had in this cause hereafter as shall have come into their hands by reason of their holding said oil and gas lease upon the twenty (20) acres interest fully set forth herein."

The defendants contend that the findings of fact and judgment are contrary to the evidence. This is an equitable action, and the findings and judgment of the trial court will be reversed if from an examination of the record it appears that same are against the clear weight of the evidence. Schock et al. v. Fish, 45 Okla. 12, 144 P. 584. If, however, the findings are not against the clear weight of the evidence, the same will be affirmed. Prentice v. Freeman, 76 Okla. 260, 185 P. 87; Renas v. Green, 88 Okla. 169, 212 P. 755; Morrison v. Krouch, 141 Okla. 288, 285 P. 10; House, Administrator, et al. v. Gragg, 170 Okla. 550, 44 P. (2d) 832.

The contention in this regard is that the finding that "said oil and gas lease was purchased by Spencer Norvell or R. S. Norvell for the use and benefit of the defendant S. S. Orwig" is against the weight of the evidence. We do not agree with this contention. A careful examination of the record leads us to the conclusion that such finding is not against the weight of the evidence. It is not even intimated by anyone that Norvell purchased the lease for his own use and benefit. It is not disputed that he paid none of his own money therefor. It is not disputed that he held the lease at all times sub-

ject to the pleasure of Orwig, and would consider no assignment of same or any disposition of the proceeds derived therefrom except upon the direction of Orwig. Orwig himself does not testify or contend that there was any definite agreement on the part of any person to take the title at the time it was sold. The entire evidence is in accord that Norvell did not intend to take the title for himself, and the definite authority for the bid and intention to take title can be traced no further than Orwig. It may be true that at the time of the sale Orwig intended to pass the title on to other persons, but even he did not know to whom it might be passed, and no other person than he was in position to direct to whom the title should ultimately go. We think the finding of the trial court thus attacked is amply supported by the evidence.

We come now to a consideration of the question whether or not the purchase of the lease at the guardian's sale by the attorney, Orwig, at the time he was representing the guardian in the matter of the sale proceedings, will or should be declared to be a purchase of such lease in trust for his client. The trial court, after finding that there was no intentional fraud on the part of Orwig in the transaction, nevertheless found for the plaintiff; the effect of the finding and judgment was to declare a resulting trust in plaintiff's favor. The conclusion of the trial court was based upon the commonly recognized rule that it is against public policy for an attorney to place himself in a position where his own interest will be antagonistic to that of his clients, except in some cases where it is shown that the attorney and client have voluntarily agreed otherwise, after a full and complete disclosure of all material facts, and where the attorney sustains the heavy burden of proving his utmost good faith and fairness in the transaction. Watts v. Jackson, 75 Okla. 123, 182 P. 508.

The rule has long since been adopted and followed by this court.

In Board of Commissioners of Okfuskee County v. Hazelwood et al., 79 Okla. 185, 192 P. 217, this court held in the syllabus, paragraph 5, as follows:

"An attorney has no capacity to deal for himself in the subject-matter of his employment without his client's knowledge and consent."

And in syllabus, paragraph 6:

"Where an attorney deals in the subject-matter of his employment without the knowledge and consent of his client, the question of good faith or fairness or adequacy of the consideration will not be inquired into. The door is shut to all investigation, on the principle that one cannot serve two masters, where self-interest is involved, and a transaction by an attorney involving the subject-matter of his employment, without the knowledge and consent of his client, is vitiated by the law, irrespective of its merits, fairness, or good faith; and whether it is injurious to the client is immaterial, because the law does not stop to speculate upon the probability that the attorney resisted temptation; the law removes the temptation by proclaiming in advance that the attorney shall not deal for himself with the subject-matter intrusted to him by his client, without the knowledge and consent of his client."

We consider the statements of law in the Hazelwood Case applicable and controlling when applied to the facts presented by this record.

The trial court found that, although the attorney, Owig, committed no overt act of fraud, he did fail to advise his client of all of the material facts. In truth the record here does not indicate in the slightest degree that the attorney advised with his client concerning the amount of the bid, or informed his client that he himself was taking title and that he would personally control and direct the future disposal of the lease, if in fact it should later be disposed of. It is suggested that a disclosure to the client of these facts was not material. The suggestion is not well taken. In a sale of this nature the client has the right to expect of his attorney a faithful devotion, to the end that the client's best interest will be served. These interests were the sale of an oil and gas lease if such sale could be advantageously made. He had a right to unbiased and unprejudiced advice concerning whether any certain bid should be received or rejected; whether a lease should be sold, or refused entirely. It was his right to expect the utmost effort on the part of his attorney to obtain for him the greatest possible benefits to be derived from a sale, or the withholding of a sale. If the attorney places himself in the position of being the purchaser, he most certainly is occupying a dual capacity with conflicting interests with respect to the exact object of his employment. He must advise the client of the sufficiency or nonsufficiency of a bid, and of the advantages or disadvantages of the acceptance thereof. At the same time, if he is the purchaser, it is to his own interest that he pay the least possible price therefor and generally obtain the greatest benefits from the

transaction. The interest of buyer and seller are inherently adverse.

It may be said, and it is undoubtedly true, that one may occupy the position as shown here without succumbing to the temptation to commit actual fraud or take undue advantage, as was evidently found to be true by the trial court in this case. However, the courts have almost universally considered that the public policy of the law demands the rule which prevents the existence of such a condition, except under the most rigid and favorable circumstances. The rule, with reasons for its existence, is aptly discussed by the Minnesota Supreme Court in King v. Remington et al., 36 Minn. 15, 29 N. W. 352. Therein the court said:

"* * * The rule which disables one occupying a confidential or fiduciary relation, in respect to property the subject of a sale, from purchasing for his own benefit, and regarding him as a trustee if he do purchase, is absolute, and looks to no other facts than the relation and the purchaser. 'No fraud in fact need be shown by the cestui que trust, and no excuse will be heard from the trustee. The fact established, and the result inevitably follows.' Baldwin v. Allison, 4 Minn. 25. (Gil. 11). The rule is entirely independent of the fact whether any fraud has intervened. It is to avoid the necessity of any such inquiry that the rule takes so general a form. Jewitt v. Miller, 10 N. Y. 402. The general interests of society require it to be so, as no court is equal to the examination and ascertainment of the truth in much the greater number of cases. Ex parte James, 8 Ves. 337. The rule stands on the moral obligation to refrain from placing one's self in relations which ordinarily excite a conflict between self-interest and integrity. Michoud v. Girod, 4 How. 503. It seeks to remove the temptation that might arise out of such a relation to serve one's self-interest at the expense of one's integrity and duty to another, by making it impossible to profit by yielding to the temptation. Nor is the application of the rule confined to a particular class of persons; as guardians, solicitors, attorneys, etc. It applies universally, to all who come within its principle; which principle is that no party can be permitted to purchase an interest in property, and hold it for his own benefit, where he has a duty to perform in relation to such property which is inconsistent with the character of a purchaser on his own account, and for his individual use. Greenlaw v. King 5 Jur. 18; Van Epps v. Van Epps, 9 Paige, 137. The duty in relation to the property need not be a legal one such as the law will enforce a performance of. If it be a moral duty, growing out of confidence and trust reposed by one and accepted by another in business relations and transactions, it is enough."

The defendants cite and rely strongly upon Watts v. Jackson, supra, wherein it is shown that the general rule prohibiting the attorneys from purchasing his client's property is not inexorable. This court there upheld the purchase by the attorney of the property, which was the subject of his employment. An examination of the case, however, discloses that it is in thorough accord with what we have said here. There the land was being sold regardless of the client's wishes. The entire matter was fully discussed with the clients and it is readily discernible that they specifically desired the attorney to do what he did, and there is shown no possibility of there being any conflict of interests between the attorney and his client in that case.

To the same general effect is Daniel v. Tolon et al., 53 Okla. 666, 157 P. 756; Minton v. Roberts, 119 Okla. 32, 247 P. 662, and other cases called to our attention. No cases have been cited, and we have found none, which permit the attorney to occupy the role here shown without at least informing the client of the existence of the adverse relationship, so that the client may be upon his guard, and may be permitted to choose freely and with full knowledge of the facts and status of the relationship, whether he will rely upon the attorney's advice, or depend upon his own ability with reference to the particular transaction. The facts here, and the authorities discussed, impel the conclusion that the judgment of the trial court is not contrary to law as here contended in this respect.

It is further contended that this action is in effect a collateral attack upon the order and judgment of the county court of Seminole county approving and confirming the sale of the oil and gas lease involved. Aside from the possible constitutional question involving the power of the county courts of this state to determine the equitable title in and to real estate, which is not discussed by the parties here, and which we do not decide, it is apparent from this record that the order of the county court does not purport to deal with anything other than the naked legal title to the oil and gas lease involved. The legal title is not attacked in this suit, the parties proceeding upon the theory that the legal title properly passed to Norvell in trust for the use and benefit of Orwig, who, by operation of law, in turn held in trust

374

for the plaintiff. The defendants cite a number of cases from this court to the effect that county courts, in the proper exercise of their jurisdiction, are courts of general jurisdiction, and that their judgments are free from collateral attack the same as any other court of general jurisdiction; among the cases cited are found Manuel v. Kidd et al., 126 Okla. 71, 258 P. 732; Moffer v. Jones et al., 67 Okla. 171, 169 P. 652; Cochran v. Barkus, 112 Okla. 180, 240 P. 321. We do not consider the citations as authority for the proposition urged. It is our conclusion that the present action in no way seeks to disturb the legal effect of the judgment of the county court under discussion.

The defendants suggest further that the plaintiff is estopped by virtue of a decree of the district court of Seminole county rendered in another cause on January 9, 1928. There were numerous parties to that suit. Defendants point specially to the following portion of the decree in that case:

"It is further ordered, adjudged and decreed that the oil and gas mining lease executed by Ollie Dunlap as guardian of the minor defendants, Freeland Pruitt and Oceana Pruitt, to R. S. Norvell under date of June 1, 1927, is a valid and existing lease in so far as the same affects the right and title of said minor defendants in and to the lands covered by said lease, and that the said R. S. Norvell has a valid and indefeasible title thereto."

They point to the fact that the plaintiff herein was a party to that suit. They make no contention, however, that the question at issue in the instant case was adjudicated in the former case. They make no suggestion that the issues made in the instant case could have been determined in the former case. There is no showing here that the plaintiff was advised of the conditions existing, upon which he based his present cause of action, at any time prior to the determination of the former suit. It was necessary that they show that the issues presented in the instant case were or could have been determined in the former case.

"Identity of causes of action is not a necessary element in the plea of estoppel by judgment, but it is necessary that the point upon which the plea of estoppel by judgment is based is an issue in the latter case and was in issue and decided in the former." Craig v. Roxoline Petroleum Co., 170 Okla. 307, 39 P. (2d) 575.

We conclude, therefore, that there is no merit in that contention.

Defendants further contend that plaintiff's petition was defective, and that a demurrer thereto should have been sustained for the reason that the petition failed to allege damages, or a state of facts from which damages could result. We find that contention is without merit. The authorities cited by the defendants in this regard support the general principle of law that fraud will not support a cause of action unless damages are shown. The rule is not applicable where no judgment for damage is sought. Here plaintiff seeks no judgment for damages, but seeks merely to recover property which is held in trust. The application of the rule where no judgment for damages is sought, is discussed in Conrad v. Darnell et al., 114 Okla. 49, 242 P. 772, wherein the court said:

"The rule that fraud without damages resulting therefrom never gives a right of action in favor of the defrauded party applies to those cases where the injured party is seeking to recover damages from the wrongdoer in an action ex delicto as an indemnity against the injury which he has sustained by reason of the fraud, and has no application to a case where it is sought to cancel an instrument because it was entered into by reason of fraud and misrepresentation."

The defendants next contend that as to the defendants Alice B. Graham, administratrix of the estate of A. E. Graham, deceased, and Pearl A. Dovell, administratrix of the estate of Gordon Dovell, deceased, the plaintiff's petition fails to state a cause of action against them in their representative capacities, for the reason that plaintiff failed to amend his petition charging the presentation of a claim against the respective estates, and failed to prove on the trial that any claim had been presented and disallowed. In support thereof they cite Walker Drilling Co. et al. v. Carlew Drilling Contractors, 109 Okla. 7, 234 P. 598. An examination of the cited case discloses that the suit there was brought to recover judgment under the terms of a contract. In Jones v. Woodward, 50 Okla. 704, 151 P. 586, this court held that a cause of action on account of the alleged fraud of an intestate is not one arising out of contract, and claim therefor need not be presented to the administrator before suit may be maintained thereon. We conclude, therefore, that this court is committed to the rule that only such claims as arise out of contract are required to be presented to an administrator. It is obvious that this is not such an action. We, therefore, hold that it was not necessary for the plaintiff to present a claim.

Finding no error in the record, the judgment is affirmed.

RILEY, BAYLESS, BUSBY, PHELPS, and CORN, JJ., concur. McNEILL, C. J., OSBORN, V. C. J., and W. V. PRYOR, Special Justice, dissent.

PRYOR, Special J. (dissenting). Conscious that each member of this court, those with whom I disagree and those with whom I agree, is doing his best to arrive at a just decision in this cause, I regret to dissent from the majority opinion. Without compelling reasons I should not dissent. Those reasons I shall give as briefly as I can under the circumstances.

On or before May 26, 1927, Glenwood Pruitt, Freelin Pruitt and Oceana Pruitt, minors, were the owners of an undivided interest in the following described land, lying in Seminole county, Okla.: An undivided interest in and to the north half of the northeast quarter and the northwest quarter of the northeast quarter of section 2, township 9 north, range 5 east; and on that date Ollie Dunlap, as guardian, filed a petition in the county court of Seminole county asking permission to lease their interest for oil and gas purposes. On the same date the county court entered its order authorizing the guardian to make such lease.

On the 1st day of June the guardian made return that he had leased the minors' undivided interest, being a 1/6 interest, in the above-described land for a bonus of $1,000, with the usual oil and gas royalty, and on that date the court made an order confirming the sale, and in this order the land was described as 1/6 of the above-described land. In the proceedings for the sale of the oil and gas lease the guardian was represented by S. S. Orwig, attorney, of Wewoka, Okla.

On the 19th day of October, 1929, Freelin Pruitt, by his joint guardians, G. L. Sandlin and W. E. Harber, filed an action against S. S. Orwig, A. E. Graham, C. E. Gragg, and Gordon Dovell, wherein he claimed that he was the owner of a one-sixth interest in the above-described land, and attacked the guardian's sale of the oil and gas lease above mentioned on the grounds of fraud, and particularly on the grounds that S. S. Orwig, the attorney for the guardian in conducting the sale, was the real purchaser and purchased the lease at the sale without the knowledge and consent of the guardian, and that the other defendants were purchasers with notice of the fraud, and asked the court to decree that the defendants hold the leasehold interest as trustees for him, and that the court require them to make a full accounting for all moneys received by them from the oil and gas produced under the lease.

During the pendency of the cause A. E. Graham died and the cause was revived against his administratrix and his heirs; and also Gordon Dovell died and the cause was revived against his administratrix and heirs.

The cause was tried before E. A. Summers, assigned judge. On the 5th day of January, 1932, the court rendered judgment against the defendant C. E. Gragg and the representatives and heirs of A. E. Graham and Gordon Dovell, and as to the defendant S. S. Orwig found in his favor and dismissed him from the cause, decreeing that the sale was invalid, and decreeing that C. E. Gragg and the representatives and heirs of Graham and Dovell held the leasehold estate in trust for the plaintiff, and that the plaintiff have a full accounting from them for all of the proceeds received by them from the leasehold estate, and found and decreed as follows:

"The court further finds that the said oil and gas lease brought its full market value at the time it was sold and that there was no fraud in said sale; the court further finds that at the time of said sale the said S. S. Orwig acted in the utmost good faith with no intention on his part to cheat, wrong or defraud this plaintiff, but that the said S. S. Orwig did not advise the plaintiff or the guardian of the plaintiff of the fact that he was the purchaser at said sale and did not make a full and complete disclosure to his client of all the material facts concerning said sale.

"The court further finds that the defendant, S. S. Orwig, in all other respects gave the plaintiff and his guardian the same full, complete and fair advice that he would have given had the sale been made to a stranger, except to advise the guardian or the plaintiff that he, S. S. Orwig, was the purchaser.

"The court further finds that the plaintiff has failed to make out a case against the defendant S. S. Orwig, and that he has heretofore sustained the demurrer of S. S. Orwig to the evidence offered by the plaintiff and said cause is dismissed as to the defendant S. S. Orwig."

The court further found that Graham, Dovell, and Gragg were not innocent purchasers.

Following this judgment, on hearing of

the accounting ordered thereby, the court gave judgment in favor of plaintiff against Graham's estate in the sum of $37,926.99, Dovell's estate $2,092.71, and against Gragg in the sum of $20,252.28.

The land in controversy was the allotment of Victoria Walker, deceased, and at the time of the contemplated sale of an oil and gas lease on the minors' interest there had been no determination of heirship, and there were upward of 30 parties who either claimed or had an interest in the allotment. Orwig had an interest in the fee, which was determined to be a one-fifth interest; defendants Gragg and Dovell had an interest in the fee and also J. L. Mainard.

Just prior to the putting up of the minors' interest for sale, there was a conference between Orwig, Gragg, Dovell, and Mainard; the purpose of the conference, according to the record, was to devise some means of getting the title to the oil and gas rights in such shape that some company would accept an oil and gas lease on it and develop the same, and there was a tentative agreement that if the guardian of the minors and Mr. Orwig, as attorney for the guardian, would put the sale through, there would be a bid by one or the other of the other parties for the lease if it was sold cheaply enough, and at this conference $1,000 was suggested as a reasonable price.

The questions in this case are whether or not Orwig, as attorney for the guardian, who conducted the sale, was the real purchaser of the real estate sold, and if so whether or not he fully informed the guardian as to his being purchaser and the guardian consented to his purchasing the property; and whether or not Graham, Gragg, and Dovell are innocent purchasers

In the consideration of this case it appears to me that the case turns more on the construction of the testimony of Orwig, who was a witness, than on where the weight of the evidence lies. Orwig's testimony divides into two parts; one part, taking his statements literally, is in favor of the plaintiff, and the other part, taking his statements literally, is in favor of the defendants. I believe it would be more readily understood to set it out as nearly as possible into the two parts.

First. He testified in substance that he was the attorney for the guardian and conducted the sale of the leasehold estate and prepared all of the papers, and when neither Gragg, Dovell, nor Mainard, who had previously agreed to appear at the sale and bid on the lease, appeared, he asked Spencer Norvell to appear and buy the lease; that Mr. Norvell did not put any money into it. About August 5th Mr. Graham gave Norvell $500 of the purchase price, and he, Orwig, gave Norvell $500 of the purchase price, and on that date or the next, Mr. Norvell paid the guardian for the lease; that Graham and Gragg and Dovell knew how the lease was held by Mr. Norvell. It was agreed between all of them that Graham was to pay one-half of the purchase price and the witness, Orwig, the other half.

After the assignment of one-half interest to Graham, the other half interest was held by Mr. Norvell for the use and benefit of witness Orwig; that one-half of the interest in the leasehold estate remained in the name of Spencer Norvell as trustee for the witness, Orwig, until after the first well came in, and he was holding it for the witness.

That at the time the assignment was made to Graham of his half interest, Graham knew the circumstances surrounding the guardian's sale. Witness had advised Graham as to that, and that at the time Norvell made the assignment of the other half interest to Gragg the witness had discussed the circumstances surrounding the holding of the leasehold estate by Norvell.

The witness did not tell the guardian that he, his attorney, was purchasing the lease.

Orwig also testified that Gragg was to have an interest in the lease on condition he paid for the same.

Second. Testimony of witness in favor of the defendants: By former agreement with Mainard and Gragg and Dovell and witness, the lease was put up for sale, and they were to bid on the lease, but when they failed to appear, witness went to Norvell's office and asked Norvell to bid on it; that it was not the intention of the witness to have any interest in the property himself, and the reason he got Norvell to bid on it was because the other parties had not appeared to bid; that he had had a previous conference with Gragg, Dovell, and Mainard, and it was agreed for the purpose of getting the whole lease in shape to have someone drill on the land, the minors' interest should put up at public auction and sold. There was no agreement that witness should have any interest in the property. Witness does not know whether Gragg and Dovell knew witness was attorney to represent the minors at the sale, but they knew that witness

wanted the land sold and the lease put through the court.

Norvell did not own any interest in the lease he took for the use and benefit of the persons who finally took it over.

The guardian was present at the sale and knew that Norvell bid in the lease. The guardian did not know in truth whether or not Norvell was the real purchaser. Witness did not discuss that with the guardian.

Witness did not tell Norvell that he was buying it for the witness, or that the witness had an interest in it. Witness never received any income from the leasehold estate in question.

Mr. Graham knew nothing about the purchase of the leasehold estate at the time it was sold at the guardian's sale.

The witness knows that at the time Norvell made the assignment to Gragg there had been a producing well drilled on the property, and at the time the assignment was made there was over $11,000 in Norvell's hands produced from the leasehold estate in question. (This, as the evidence hereinafter will show, was a mistake.) The assignment from Norvell to Gragg was dated the 17th day of January, 1928.

Witness states that at some time he would like to make a full explanation to the court with reference to the handling of this matter to show his good faith. The court stated that he did not think it was necessary, the court thought the witness had acted entirely fair in this matter, and the court could not see how he could have acted with more good faith.

At the time this sale was made there was not much activity with reference to buying and selling of oil and gas leases in the immediate vicinity of this land. There had been a well drilled in section 10 south, and while this sale was being put through there was a dry hole drilled between the land in question and the well.

All of the parties, including the guardian of these minors, interested in the land in question were anxious to have the property leased and developed.

In representing the guardian of the minors the witness in putting through the sale gave the guardian the benefit of all his knowledge and information regarding it, both as a lawyer and as an individual owning oil and gas leases and royalties in the community, and put the sale through just like the minors had been his own children, and he advised the guardian as fairly and fully in the sale as any other client would have been advised. The guardian was advised that the sale was made for the benefit of the minors in order that their interest might be developed for oil and gas. There was never any intention on the part of the witness to wrongfully procure the interest of the minors in the property.

Witness believes first well was drilled in April (1928). Asked whether or not witness had advised Gragg, Dovell, and ·Graham that the sale was fairly and legally made, witness replies that Mr. Graham was a lawyer and he examined the records and knew . that Mr. Norvell was holding the lease. Witness told Mr. Graham that if he thought too much had been bid for the lease, he would split the purchase price with Mr. Graham and Mr. Graham could pay half the purchase price and the witness would pay the other half. Witness did not take the lease with the intention of holding it himself. If he had intended to buy the lease himself, he would not have put the sale through. All the witness was trying to do was to get the title cleared up so that the same could be drilled, and the reason he had Mr. Norvell to bid was that the parties who had agreed to appear and bid did not appear. He expected either Mainard, Gragg, or Dovell to be at the sale and bid.

That on the hearing in the county court for allowance of attorney fees to Mr. Graham for clearing up the title witness did not remember testifying that he had no interest in the lease sold at the guardian's sale, but probably that was true because that was a fact. All witness ever got out of this deal was that he got stuck for $500.

Norvell's Testimony: Witness never owned any interest in the property, never received any rents or royalties from the same. He bid the property in at the request of Mr. Orwig and he paid the $1,000 of the purchase price to the guardian. Graham give him $500 and Orwig $500 of the purchase price. He made the assignment to Graham with the consent of Orwig and would not have made it otherwise.

Subsequent to the purchase of the property he had a conversation with Orwig; the occasion of the conversation was that he had received a check from the Superior Oil Corporation for approximately $1,100. When he received that check witness was surprised because he thought he had trans-

ferred all of the interest in the lease, and went to Mr. Orwig and told him that if the property was producing he wanted 'it out of his name, as he, witness, owned no interest in it and did not want money to come into his hands. Orwig told him to keep the check, that it wasn't his, and afterwards he gave the check to Gragg, he supposes at the request of Orwig. He could not say whether he had made the assignment at that time or not, but the same was not on record. He knew at that time he did not have any interest in the leasehold in question and Orwig told him that he was not the owner of it.

Testimony of J. L. Mainard: He testified that he and his brother owned a fee interest in the lands in controversy. Testified substantially as the other witnesses as to getting the title to the lands in shape to have the same drilled for oil and gas; that after the sale Orwig, Gragg, Graham, and himself were at the Aldridge Hotel and Mr. Orwig said that they were not there to bid it in, so he had Spencer Norvell buy it in, and Orwig told witness to go to Spencer Norvell's office the next morning and see him and tell Norvell to assign the interest to Mr. Graham, but Mr. Gragg seemed to have some interest in it that was doubtful, so Orwig told Mr. Graham to take the interest and then go ahead and clear up the title and whatever attorney fees were made for clearly up the title Mr. Graham and Mr. Orwig divided. Witness believes that Mr. Graham was to take assignment for all of the minors' interest in the leasehold estate.

Gragg, one of the defendants, testified that prior to the sale of the lease in question, he owned an interest in the land. That he and various other persons who had acquired interest in the lands were trying to work out some plan whereby they could have the land developed for oil and gas. That he discussed with Mr. Orwig the question of having the minors' interest sold. This discussion took place some time in May. He told Orwig he would bid $50 an acre for the minors' interest. The witness and Orwig went to Graham's office in Okmulgee in the latter part of July, 1927, and they agreed with Graham that they would meet the other interested parties the same evening in Wewoka.

Witness told Orwig to assign a half interest in the lease to Graham. The other half interest was held by Norvell for the use and benefit of witness, and was assigned to witness on the 17th day of January, 1928. The oil runs from that interest were paid to

the witness. Witness believes he received the first check on the 2nd day of July, 1928. The first well came in on the lease in April or May. At that time the minors' interest in the lease was vested in Graham and Norvell and witness. The first check for witnesses' half interest was made payable to Norvell because witness had not recorded his assignment prior to the bringing in of the first well. The check received by Norvell was signed by the witness.

Dovell had an interest in the fee acquired some time in May, 1927. He authorized a bid to be made for $50 an acre for the lease at the sale of the same for himself and Mr. Dovell. The witness did not pay the guardian the purchase price of the lease. He left that to Mr. Orwig. Witness never paid Orwig the $500. Witness offered to pay Orwig several times before suit was brought.

Witness never asked Norvell to buy the property for him, but authorized Orwig to make a bid for him of $1,000. Witness has known Mr. Orwig for a good many years and has been interested with him in other transactions, and it was not unusual for witness to owe Mr. Orwig.

On the 4th day of January, 1928, the owners of the lands described, including the holders of the leasehold in question, entered into an oil and gas lease contract with the Superior Oil Company, whereby it was agreed that the company should drill a first well or test well free on the premises and pay the usual royalties of 1/8 of the oil and gas to the fee owners, and it was agreed that the working interest should be divided 3/8 to the fee owners and the holders of the leasehold estate in question and 5/8 to the company. The company was to develop the property and operate the same and the expenses of the development and operations should be borne, the fee owners and holders of this lease 3/8 interest, and the company 5/8 interest, excluding the first well. At the time of the accounting in this case, under this lease and agreement, there had been produced and sold $1,836,553.20 in oil and gas, and the plaintiff herein had received his royalties.

As the evidence shows, there were two conferences held between some of the feeholders and Mr. Orwig, the first some time prior to the 26th day of May and one some time about the 25th day of July, after the sale of said lease, at which Gragg, Mainard, Dovell, and Graham were present. Graham was not present at the first conference. The purposes of these conferences

were to get title to the land and the leasehold estate of the minors in shape to have the property developed, and the record discloses that there were no plans laid or schemes discussed at these conferences which were antagonistic to the interest of the minors. It was to the best interest of all parties to have the lands leased and developed. The interest in this lease of the minors and the other feeholders were mutual; whatever benefit the other feeholders received was also received by the minors.

As will be noticed from the findings of the court set out above, Orwig was the real purchaser at the guardian's sale of the leasehold estate in question, and he did not inform the guardian, his client, that he was purchasing at the sale. This finding must be based upon the testimony of Orwig wherein he stated in answer to one question that Norvell was holding for his use and benefit, and in answer to another question that Norvell was holding for him in trust, and upon the fact that Orwig paid one-half of the purchase price to Norvell.

The evidence discloses, as set forth above, that Orwig testified that there was no intention on his part of being a purchaser of the minors' lease interest; that there was no agreement or understanding that he should jointly own this lease with the other parties, and positively stated that the leasehold of the minors sold was held by Norvell for the parties who finally took it. He also testified that he did not remember whether he testified at the hearing in the county court to fix the fee of Graham for representing the minors in clearing up the title to this land that he had no interest in this leasehold estate, but he must have, because that was a fact. Also, when Norvell received the first check from the oil company and Norvell called Orwig's attention to it, Orwig stated to Norvell that it was not his check, that he had no interest in it, and told him to deliver it to Gragg. The evidence further shows that Orwig never at any time claimed any interest in this leasehold estate or received one penny of benefit from the same.

The evidence further shows that Orwig advised the guardian in all things to the same effect as if he had been a stranger and handled the sale the same as if the minors had been his own children. It is a fact that Orwig was asked if he told the guardian he was the purchaser and Norvell held it for him and he stated he did not. From the view I take of his testimony, it is a matter of course that he did not tell the guardian that he was the purchaser and Norvell held the leasehold for Orwig, for if he had told the guardian that, he would have told him something that was untrue according to this record.

The evidence shows that at the time the sale was called and neither of the parties whom Orwig had expected to appear and bid did appear, he went to Norvell and had Norvell to bid, explaining the reason to Norvell why he wanted him to bid. Orwig no doubt was handling this sale from the very beginning and managing it and there is no doubt from the record that Norvell was to hold this and assign it to the parties who were to be there and bid at the direction of Orwig.

My interpretation of the testimony of the witness Orwig that the property was held for his use and benefit and held in trust by Norvell for him, is that he had in mind and intended that it was held at his direction as attorney representing the guardian of the minors and not in fact for the use and benefit of the witness himself.

Giving it this interpretation, it is consistent with all of the circumstances and the facts and the testimony in this record and is consistent with the testimony, including the testimony of Orwig himself. To give it the literal interpretation that he meant that the lease was held by Norvell for his, Orwig's, use and benefit and in trust for him, then it is inconsistent with all the facts and circumstances in this case and irreconcilably inconsistent with the testimony of Orwig himself.

Orwig unquestionably was the more interested in the development of this property than any other parties interested, for the reason that he had the largest interest. The records show that he was most active in having this property developed, and that he realized that in order to have this property leased and developed the minor's interest must be sold. After the dry hole came in between this property and the well south of it, the other parties seem to have lost interest. At the first conference after the sale of the property there was a dispute between the parties who were to bid on the property with Orwig and Graham about the bid being too high, or rather I should say an agreement that the minors' interest had sold too high.

Under all of the circumstances and the position Orwig was in at that time, it would not be unnatural for him to advance or chance $500 to save the sale and save his

efforts in getting the title in shape to lease. The only reasonable deduction to make from the paying of the $500 by Orwig was that he put the money in for that purpose and with the expectation of receiving it back from one of the parties who were to bid at the sale and not with the intention of acquiring an interest in this leasehold estate.

Giving these items of evidence the interpretation that I am giving them, then it is certain that Orwig's testimony is consistent with the court's finding that he acted in the utmost good faith.

It will be noted from the above that Orwig testified that the assignment by Norvell to Gragg was after a well had come in on the property. The assignment to Gragg was made on the 17th day of January, 1928. The lease under which the property was developed was executed on the 4th day of January, 1928, and filed of record on the 27th day of January, 1928. Both Orwig and Gragg testified that to the best of their memory the first well came in about April or May, 1928, so if this is material Orwig was mistaken as to the relative time as to when the first money was received and as to when the assignment was made to Gragg. Gragg states that the check was received on the 2nd day of July, 1928.

It is difficult to reconcile the findings and conclusions of the trial court as to the acts or of Orwig as attorney for the guardian in conducting this sale, either with themselves or with its conclusion. If Orwig acted with the utmost good faith and without fraud, as found by the court, then he did everything that he should have done in the premises and did nothing that he should not have done. The findings of the court that he was the real purchaser could mean nothing less than that he had the bid made in the name of Norvell to conceal the fact that he was the bidder. It is the only conclusion that can be reached from a consideration of the court's findings. This is not good faith on the part of the attorney. The trial court found and concluded that Orwig had acted in the utmost good faith and exonerated him on account of his acts and dismissed him from the case without any liability, yet on account of the acts of Orwig as attorney for the guardian he holds the sale invalid, and holds that the defendants were not innocent purchasers, and passes the consequences of the acts of Orwig as attorney for the guardian on to them, and they, according to the decree, are to bear the full burden of these acts.

The position of a lawyer to his client is one of great trust. He must not use this position to his advantage. The outstanding fact in this case is that Orwig never used his position for his own benefit or to the injury of his client.

In effect, the decree is that property passes from innocent hands to guilty hands. Graham, Gragg, and Dovell owed no obligation whatever to the minors or their guardian. There was no intimation that they imposed on the minors or their guardian, or their attorney.

Orwig states that he discussed how the purchase was made by Norvell with the purchasers, Graham, Dovell, and Gragg. It would be much more reasonable to find that Orwig told Graham, Gragg, and Dovell that Norvell was holding the lease for Gragg and Graham on account of their not appearing and bidding than it would be to hold that he told them that Norvell held the property for him, Orwig. It is much more reasonable to draw the conclusion from the evidence that if Orwig was the real purchaser, these parties were innocent purchasers, than to find that Orwig from the evidence was the real purchaser.

It is agreed by all parties that the minors received at this sale the full value of the property and they were not injured in the sale of the lease and no wrong was done them. The court so finds.

The purpose of this action is to establish a constructive trust. The burden rested on the plaintiff to establish his case with clear, convincing, and satisfactory proof. Boles v. Akers, 116 Okla. 266, 244 P. 182; Hayden v. Dannenberg, 42 Okla. 776, 143 P. 859.

It is my conclusion from the evidence that the plaintiff failed to carry this burden.

The primary purpose of the courts of equity is to prevent wrongs, remedy wrongs and enforce rights, to administer justice. My firm conviction, after careful and thorough consideration of all the facts and circumstances in this case, is that the judgment of the trial court is clearly against the weight of evidence, in fact, against all of the evidence, if the evidence is given a natural, reasonable, and sensible interpretation.

The gravest error that the trial court can commit is to render judgment for the wrong party. This court, especially reviewing an equity case, as this is, should not hesitate to correct such error.

The judgment of the trial court should be reversed, with directions to enter judgment for the defendants in this case.

McNEILL, C. J., and OSBORN, V. C. J., concur in this dissent.