## SUPERIOR OIL CORPORATION v. WILSON, Ex'x, et al.

No. 28736. April 9, 1940.

Rehearing Denied June 18, 1940.

*103 P. 2d 535.*

Busby, Harrell & Trice, of Ada, Gibson & Holleman, of Tulsa, and R. J. Roberts, of Wewoka, for plaintiff in error.

Blakeney, Wallace & Blakeney and Beets, Zeeman & Beets, all of Oklahoma City, Tom Huser, of Wewoka, C. T. Huddleston, of Ada, and Banks, O'Brien & McVey, of Independence, Kan., for defendants in error.

WELCH, V. C. J. This is an appeal from the district court of Seminole county, Okla., involving a suit to impress a trust, to terminate trust, and for an accounting, in and to a 1/6th interest in a certain tract of land in Seminole county, Okla.

This action was originally filed by Freelan Pruitt on December 26, 1933, against the Superior Oil Corporation. He died on May 19, 1934, and the action was revived by Mattie Wilson, executrix of the estate of Freelan Pruitt, deceased, on January 14, 1936. September 21, 1937, C. W. Sandlin intervened, asserting that he had acquired an interest therein by virtue of a contract between himself and Mattie Wilson individually.

Essential facts are that Freelan Pruitt, a minor, who attained majority December 25, 1931, owned an undivided 1/6th interest in a tract of land. During his minority an oil and gas lease on his interest in said land was sold through probate court to one Norvell and came by assignment to be owned by A. E. Graham, C. E. Gragg, and Gordon Dovell, hereinafter called "assignees." By the terms of the lease the "assignees" were to prospect and develop the land for oil and gas and have for themselves 7/8ths of the production and pay to the minor 1/8th of the production. The "assignees" by a bargain with the Superior Oil Corporation assigned to Superior a certain interest or portion of the lease in consideration of the agreement of Superior to drill and develop the premises. As agreed, Superior did drill and develop the premises and produced oil therefrom. Up to this point the rights of the parties to the oil production, so far as disclosed by the records, were as follows: The minor was entitled to 1/8th royalty by the terms of the original lease; the "assignees" were entitled to the portion of the 7/8ths working interest which they had reserved by their bargain with and assignment to Superior; and Superior was entitled to the portion of the 7/8ths working interest assigned to them by "assignees," and for which Superior had agreed to and did develop the premises.

But the minor had sued the "assignees" and recovered from them the portion of the 7/8ths working interest they had attempted to reserve for themselves. This recovery was had by the minor on the theory that by reason of the method employed in obtaining the

original lease to Norvell, which was fully known in detail by the "assignees," the said "assignees" held the lease in trust for the minor. See Gragg v. Pruitt, 179 Okla. 369, 65 P. 2d 994. Thus by that litigation the record rights of the "assignees" came to be recognized as rights belonging to the minor, who thereby owned his own original ⅛th royalty interest, together with the reserved portion of the ⅞ths working interest which did not pass by assignment from the "assignees" to Superior.

By this action the ward, Freelan Pruitt, after reaching majority, seeks to recover from Superior the remaining interest in the lease, being the portion of the ⅞ths working interest assigned to Superior by the "assignees," and received by Superior on its agreement to drill and develop the premises. Or, to state it more exactly, plaintiff by this action seeks to recover from Superior a portion of the total value of oil produced equal to the portion of the working interest conveyed to Superior by "assignees" as to plaintiff's interest in the land.

We should here note that legal title to the leasehold interest fully passed to the original lessee, Norvell, and by assignment to the "assignees." It has never been adjudged otherwise, nor contended otherwise, either by the plaintiff in the former litigation or by the plaintiff, Freelan Pruitt, in this action or by the successor plaintiff herein or by the intervener. It would follow that legal title passed to Superior to that portion or interest assigned by "assignees." It was determined in the prior litigation that while "assignees" held title to their retained interest in the lease, they held it in trust for the benefit of the minor.

By the terms of the lease "assignees" were obligated to prospect and develop the premises for oil. The fact that they held in trust for the benefit of the minor did not lessen their duty to drill and develop. That fact, if affecting their duty to develop at all, might be said to have increased it. Whatever they held in trust for this minor, they should have

diligently held. Holding a leasehold privilege and right to drill for and produce oil, in trust for the ultimate benefit of the minor, they should diligently drill, or prudently obtain the drilling and development. See Gragg v. Pruitt, supra; In re Bowman's Estate (Pa.) 2 Atl. 2d 725; Lancaster Bank v. Marshel (Neb.) 264 N. W. 470; Crane v. Owens, 180 Okla. 452, 69 P. 2d 654; Graham v. Dunlap, 179 Okla. 295, 65 P. 2d 538.

If "assignees" had themselves drilled the wells to production and consequent great profit, and had accounted to the minor for the production, either voluntarily or after suit, it seems reasonable to say that they would have been entitled to deduct the cost of production. If they had prudently paid someone else in cash to drill, they would have been entitled to deduct such cash expenditure, or to have the lessor reimburse them out of the production. If they, holding the lease in trust for the minor's benefit, had prudently contracted to obtain the drilling and to pay therefor out of the oil produced, or by and with a reasonable amount or per centum of the oil produced, such a contract should be regarded as properly in the discharge of their duties as holders in trust, in view of the circumstances of this particular trust. Then it would seem to follow that when they procured the drilling and development by conveying to Superior an interest in the lease, such interest would fully pass to Superior, if the agreement was a prudent one, and the interest conveyed to Superior was a reasonable and proper consideration for the drilling and development of the premises.

In Restatement of the Law of Trusts, sec. 283, this rule is stated:

"If the trustee transfers trust property to a third person or creates a legal or equitable interest in the subject matter of the trust in third person, and the trustee in making the transfer or in creating the interest does not commit a breach of trust, the third person holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary."

And in the same authority, sec. 296, there is this statement:

"If the trustee transfers trust property in breach of trust to a transferee for value, the transferee takes free of the trust although he had notice of the existence of the trust, unless he has notice that the trustee is committing a breach of trust in making the transfer."

In this case the oil production was quite substantial, and resulted in large benefits to the minor, as the owner of the ⅛th royalty, and the adjudged owner of the substantial portion of the ⅞th working interest reserved by the "assignees" when they dealt with Superior. Those benefits were fully enjoyed by the minor until his majority, and two years and one day thereafter before filing this suit, and we assume that since this suit was filed such benefit has been enjoyed by the plaintiff Pruitt and his successors in interest. No such benefits could have resulted but for the drilling and developing of the lands for oil. They all in fact followed and resulted from the drilling and development obtained by the bargain between "assignees" and Superior.

When one is beneficial owner of property or rights, held in trust for his benefit by another, and the trustee makes a prudent bargain, resulting in great benefit to the owner, who receives and fully enjoys the fruits of the bargain, equity will not be exercised to return also the consideration paid out in the bargain. It is not contended that the contract made by "assignees" with Superior was in any sense unreasonable, or that the assignment made to Superior was in any sense excessive when made.

In fact, the conduct here goes far towards showing complete ratification. The benefits of these transactions were accepted, in large sums, by the minor and his guardian, and by the ward after obtaining majority, and by the successor plaintiff. There was never any direct repudiation by suit to cancel or the like. This action in effect would recognize the validity of the conveyance to Superior, but by appeal to the equitable power of the court would seek to impress the trust character on the consideration paid for developing the corpus of the original trust, that is, the oil and gas leasehold, or the right to drill and develop.

The trial court's judgment for plaintiff was based on the conclusion that defendant Superior had constructive knowledge of the details of the obtaining of the original lease by Norvell, and had constructive knowledge that "assignees" held the lease in trust for the benefit of the minor. If that be accepted as true, it would not necessarily follow that the contract assignment to Superior would fall, under the circumstances here existing. The premises being undeveloped theretofore, it might well be said that the adjudicated trust holding by "assignees" was a holding for development, and would support, as in due execution of the trust, a reasonable and proper contract for such development, as for the benefit of the real owner. However, we do not find such conclusion of knowledge by Superior to be supported by the evidence.

It was shown by clear and convincing evidence that "assignees" had actual knowledge in detail. See Gragg v. Pruitt, supra, but that showing was not made until it was developed in the litigation long after Superior had taken its assignment and developed the premises and produced oil therefrom. It is fair to assume that "assignees," at the time they were dealing with Superior, were concealing details well known to them, or at least were refraining from making any disclosure thereof whatever, because they were trying to bargain for a valuable reservation to themselves, and did do so.

While it was later shown that "assignees" had knowledge of all details, it was not so shown as to Superior. That is, it was not shown that Superior had notice or knowledge that Norvell bought and held the lease for Orwig, or of any details of the sale of the original guardian's lease, or of the details as to payment of the consideration for the original lease, or any notice or knowledge of the

trust character of the holding by "assignees."

There was evidence of some statements made to one Hayden, then an employee of Superior, who was obtaining signatures or closing other details for Superior in connection with this assignment. There was conflicting evidence as to the capacity in which Hayden was employed. He was not in charge of titles and did not pass upon them. He was employed in a lesser capacity, probably to handle closing and signing details. but his exact capacity is not of controlling importance. He did discuss the leasing and assignment details with "assignees" and those interested with them. He was told, or it was said in his presence, in effect that the title to the minor's interest lease was bad or was not perfect or that another sale would be necessary to pass title; and also by a general observation or statement in effect that the lease had not been paid for. These statements in the evidence fall far short of equalling the clear showing of detailed knowledge in "assignees," and when considered in connection with the existing circumstances, do not show notice to Superior. If the first statement is taken literally, it was not correct. The title was indicated by the record as being perfectly good and based on a valid sale, and, as heretofore pointed out, it was not contended that it did not pass legal title. If that statement was made exactly as stated in the evidence, an examination of the record by the title examiner would have dispelled any doubt as to the validity of the sale and the resulting title in the "assignees." There was nothing in that statement to indicate any holding in trust. As to the record statement relative to nonpayment for the lease, if made at or about the time of the assignment to Superior, it was incorrect. That consideration was not paid when the minor's lease was sold and confirmed, but it had been paid some months before January, 1928, when Superior took the assignment. There is nothing to indicate that if these items had been deemed sufficiently important to justify investigation and had been investigated, any disclosure would have followed of the details of the guardianship sale, not shown of record, but which afterwards came to light.

In Gragg v. Pruitt, supra, there was ample supporting evidence, but not so here. With "assignees" holding an oil and gas lease in trust for the benefit of the minor, upon undeveloped land, and making a prudent contract and reasonable partial assignment to procure development, and thereby procuring development of great value and benefit to the minor, equity should not take from the developing company the assigned consideration upon a finding of the holding by "assignees," unless notice sufficient to constitute constructive knowledge is shown by clear and convincing proof. The showing here does not approach that requirement. The proofs by Superior of lack of knowledge in any of its officers; the fact that Superior took this assignment, in reliance on the record, and expended much money in drilling and developing, and in fact had no knowledge contrary to the record showing, are most persuasive.

See Kowalsky v. Kimberlin (Cal.) 160 P. 673; Kennedy v. Bridge, 120 Okla. 51, 250 P. 427; F. B. Collins Inv. Co. v. Waide, 70 Okla. 191, 173 P. 835, and Brooks v. Tucker, 83 Okla. 255, 201 P. 643.

From the whole record we are quite convinced that, according to the clear weight of the evidence, Superior took this assignment without any knowledge, and without notice of any fact sufficient to direct inquiry, as to the trust character of "assignees'" holding; that Superior took this partial assignment in good faith, for a valuable consideration, and by performing its required duty in the bargain, contributed largely to the due execution of "assignees'" trust, to the enrichment substantially of the plaintiff. We find no basis in equity to take from Superior its assigned interest or the proceeds thereof.

The plaintiff cites authority for the rule as to burden of proof, and degree

of proof, on the question of innocent purchaser, in cases of conveyance procured by fraud, but this case does not involve such fraud as was pointed out in the former decision.

The plaintiff cites decisions to the general effect that notice of facts sufficient to excite attention and put a party on guard, and call for inquiry, is effective as knowledge, but such rules are not applicable under the circumstances here for the reasons pointed out.

The plaintiff contends this assignment to Superior was without consideration because Superior was already obligated to drill the premises by virtue of its agreement with owners of the remaining five-sixths interest in the land. The facts are that Superior took assignments or leases from all the owners of interests in the tract, and with each of such owners agreed to drill. That is a usual and ordinary procedure. With several such owners it is hardly possible to deal simultaneously with all. The agreement to drill would necessarily be made first with one or more of the owners, and thereafter with others. Nevertheless the agreement with the last owner of a fractional interest to drill for his benefit, to the extent of his interest in the land or lease, would furnish ample consideration for his assignment. Here Superior had agreed with other owners to drill a day or two before closing with "assignees," but it was all part of the general plan to acquire all the leases or a fair interest therein and then develop the premises. We find no merit in this contention. See American Law Institute, Restatement, Contracts, vol. 1. sec. 84; Earp v. Mid-Continent Pet. Corp., 167 Okla. 86, 27 P. 2d 855, 91 A. L. R. 188; Compton v. People's Gas Co., 75 Kan. 572, 89 P. 1039, 10 L. R. A. (N. S.) 787.

The defendant with some merit presents defenses based upon the statute of limitations, and "laches," and defective party plaintiff, but we deem it unnecessary to discuss them in any specific detail.

Upon our conclusion that the finding and judgment is against the clear weight of the evidence, the judgment is reversed, and the cause remanded, with directions to render judgment for the defendant.

BAYLESS, C. J., and CORN, HURST, and DAVISON, JJ., and McLENNAN, Special Justice, concur. OSBORN, J., concurs in conclusion. RILEY, J., and LYDICK, Special Justice, dissent.

———

LYDICK, Special Justice (dissenting). It is for us to determine whether the Superior Oil Corporation is an innocent purchaser for value and without notice. On January 6, 1928, this purchase was made by the Superior Oil Corporation from one C. E. Gragg and one A. E. Graham, who the record then showed to be the owners of the interest by them assigned. Witnesses testified that they gave certain information to a Mr. Hayden, who was an agent of the oil company. Plaintiff in the court below says this information thus imparted to said agent is sufficient to constitute notice to the oil company of the infirmities in the title held by Gragg and Graham, the assignors. This the oil company denies. We will first consider the nature and extent of Mr. Hayden's agency and his duties in that regard.

The leasehold estate involved herein is located in Seminole county, not far from Wewoka, the county seat. In the trial Mr. John H. O'Rear testified as a witness for the oil company. At the time the oil company purchased the leasehold estate here under consideration, he was an officer of the corporation. On cross-examination, and concerning Mr. Hayden, the witness said:

"He was a man with the Superior Oil Corporation in the land end of it." * * * "He looked after the titles in the land department."

We learn from the testimony of various witnesses appearing in the record that Mr. Hayden, as the oil company's agent, was quite active in negotiating with Gragg and Graham for the pur-

chase, by the oil company, of the interest in the leasehold estate.

J. L. Mainard testified he was asked whether he had talked with any of the agents or officers of the oil company with regard to this leasehold estate. He said that he talked with Mr. Hayden and stated that "I think Mr. Orwig got in touch with the Superior Oil Corporation and worked the deal up and Mr. Hayden came down." Mr. Orwig testified that Mr. Hayden "was down here about straightening up that title—he seemed to be the land man for the Superior and he worked on the title for them."

Mr. C. O. Fanninghausen testified that he had a conversation with Mr. Sandlin and Mr. Hayden. He said:

"Mr. Sandlin did the talking and he informed Mr. Hayden that from the information that he had obtained at Wewoka that the sale of the minors' interest was bad."

To this statement he said Mr. Hayden replied and said that "he was interested in getting a good title to the property."

Mr. G. L. Sandlin testified that he had talked with Mr. Hayden in Tulsa. Concerning Mr. Hayden, the witness said:

"He was in the land department, he was handling the titles and he was their land department manager."

He said that Mr. Hayden is "the man that handled the land for the Superior so far as" he knows. Witness said he talked with Mr. Hayden and said to him:

"I told him what I had found in Seminole county, and saw Mr. Orwig and that the lease had been sold once before and the money had not been paid and that the man whose name it was bought in didn't pay for it and that the attorney said he did not pay it."

He testified that at a later date he talked with Mr. Graham in the presence of Mr. Hayden and that the sale of the minors' leasehold was then and there discussed. The witness said:

"I again told them that if anybody got title to that, there would have to be another sale."

Mr. Eugene Wilson testified to a conversation had by and between himself and Mr. Hayden and Mr. Sandlin. He said:

"Mr. Sandlin said that the thing couldn't be leased as long as they had the minors' part in it and that the minors' part was in bad circumstances."

In that conversation he said:

*"Mr. Hayden said, as well as I remember, that the title was in bad shape."*

We italicize this statement because we think it is very material here. We will again refer to this statement later in this opinion.

Having considered the evidence, we turn to the applicable rules of law on which the sufficiency thereof must be determined.

Section 13 of Title 25, Okla. Stat. Ann. provides:

"Every person who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, and who omits to make such inquiry with reasonable diligence, is deemed to have constructive notice of the fact itself."

It has generally been held that this section is a mere statement of the common law principle.

In Wood v. Carpenter, 101 U. S. 141, 25 L. Ed. 809, it was stated:

"Whatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it." Kennedy v. Green, 3 Myl. & K. 722.

That principle was adopted by the Supreme Court in Thomas v. Huddleston, 65 Okla. 177, 180, 164 P. 106, and the same principle has been approved consistently for more than 20 years. In this last case the court said:

"From the foregoing it is clear that defendants had notice of circumstances sufficient in themselves to excite atten-

tion, and put a reasonably prudent person upon inquiry as to the particular facts establishing the fraud with which the entire transaction, culminating in the deeds to Huddleston, was tainted. Having failed to exercise ordinary diligence in the pursuit of such inquiry, defendants are chargeable with the actual knowledge they should otherwise have received." Trosper v. McKee, 153 Okla. 12, 4 P. 2 755; Dow v. Worley, 126 Okla. 175, 256 P. 56; Wapa Oil & Devel. Co. v. McBride, 84 Okla. 184, 201 P. 984.

The oil company here questions the truthfulness of the testimony given by the witnesses as hereinbefore considered. Particular reference is made to the fact that the witness Eugene Wilson is a brother of the plaintiff here. In the testimony of these witnesses, we find no contradictions or inconsistencies and no inherent probabilities appear therein. By no evidence was their character questioned nor their general reputations for truth and veracity attacked. The learned judge of the lower court saw these witnesses upon the stand, observed their demeanor and their candor or lack of candor. He believed them. We have only the cold and barren record before us, and from it we cannot say that the learned judge erred in believing their stories to be true.

Having placed reliance upon the testimony of the witnesses hereinbefore set out, it is for us now to determine whether the information by them imparted to Mr. Hayden was sufficient "to excite attention and put the party on his guard and call for inquiry." Supplementing, but not denying, the rules of law hereinbefore quoted as to the sufficiency of the notice, we find that the authorities say that "notice, in order that it may be effectual, should be precise and complete enough to put the defendant upon his guard." The quotation is from the case of Kowalsky v. Kimberlin et al. (Cal.) 160 P. 673. We approve that rule.

The rule in relation to general and indefinite information imparted to a party sought to be charged with notice may be thus stated. No matter how general and indefinite may be the statements made to a party concerning the title to property which he is about to purchase, if such information so given is sufficient actually to cause him to believe that there are infirmities in the title, he is charged with notice of all such defects in the title as reasonable inquiry would have disclosed. Considering that the statements made to Mr. Hayden were rather general in their nature, were they nevertheless sufficient "to excite attention and put the party on his guard and call for inquiry"? This court is relieved of the burden of answering that question because Mr. Hayden himself has answered it.

The witness, Eugene Wilson, testified. He said:

"Mr. Hayden said, as I remember it, that the title was in bad shape."

The statement of the witness stands unrefuted and the witness stands unimpeached. In determining the sufficiencies of the information imparted to a party who is sought to be charged with notice, the question is whether the information thus given to the party was sufficient to excite his attention and put him on guard for defects concerning which he should inquire. Ordinarily the court, treating the party as a reasonably prudent man, must draw its own conclusion as to whether the information given the party was sufficient under this rule. No case can be found where the facts and the circumstances surrounding all the parties are entirely similar to the situation in the case at bar. General rules of law are applicable, but, after all, every case, like every tub, must stand upon its own bottom and the court's judgment controlled largely by peculiar situations in the case different from those in the other cases discussed in the books. Without having heard from Mr. Hayden, we believe, as did the learned judge of the trial court, that the information was sufficient. We are now confident of this conclusion since Mr. Hayden himself has spoken in language, in effect, admitting the sufficiencies of this notice to him under the applicable rules.

In the lower court it appears that the plaintiff there proceeded upon the theory that the burden rested upon her to affirmatively disprove the oil company's plea set out in its answer that it was an innocent purchaser for value. Perhaps reliance was there had upon the rule announced by this court in Fickel et al. v. Webb, 146 Okla. 16, 293 P. 206. That was a suit in equity, wherein the court said:

"The defense of being an innocent holder for value must be pleaded and proved. It is an affirmative defense. The plaintiff made out a case establishing fraud in the execution of the Mirtschin deed. Thereupon the burden shifted to those endeavoring to avail themselves of the facts which would constitute them as innocent purchasers for value to establish those facts. This they failed to do. Exchange Trust Co. v. Godfrey, 128 Okla. 108, 261 P. 197; Gay v. Williams, 102 Okla. 37, 226 P. 88; Adams Oil & Gas Co. v. Hudson, 55 Okla. 386, 155 P. 220."

In section 5 of the syllabus the court said:

"When the plaintiff makes out a prima facie case of fraud, the burden shifts to the one claiming to be an innocent holder to prove that his interest was acquired without notice of the defect, in good faith, and for value."

The rule is followed and exemplified in Adams Oil & Gas Co. v. Hudson, 55 Okla. 386, 155 P. 220 (see section 2 of the syllabus); Whayne v. Seamans, 95 Okla. 168, 217 P. 859 (section 1 of the syllabus); Austin v. Evans, 132 Okla. 238, 270 P. 26 (section 1 of the syllabus); Tucker v. Leonard, 76 Okla. 16, 183 P. 907 (section 9 of the syllabus); McIntosh v. Holtgrave, 79 Okla. 63, 191 P. 739 (section 5 of the syllabus); Myers v. Harness, 116 Okla. 268, 244 P. 1109 (section 3 of the syllabus); Morton v. Roberts, 88 Okla. 263, 213 P. 297 (section 3 of the syllabus); Choctaw Lumber Co. v. McKeever, 119 Okla. 282, 249 P. 712 (section 2 of syllabus).

Unnecessarily the plaintiff below apparently assumed the burden of making prima facie proof that the oil company was not an innocent purchaser. We have concluded that the plaintiff did make at least prima facie proof that Mr. Hayden, the company's agent, had sufficient notice of the infirmities in the title to excite his attention and put him upon his guard and call for further inquiry.

We must determine whether or not Mr. Hayden was such an agent of the oil company that the company would be charged with notice imparted to this agent.

We refer to Langley v. Ford, 68 Okla. 83, 171 P. 471. The opinion of this court was written by Mr. Justice Hardy. In that case, one Tarkington had taken from the owner of land an application for a loan upon the farm. The application was addressed to the Deming Investment Company and the securities sold to E. E. Ford. Langley defended upon equitable rights not appearing upon the face of the record. Ford pleaded that he was an innocent purchaser for value without notice. Langley urged that information given to the witness, Tarkington, should be imputed to the holder of the mortgage and that such information was sufficient to charge the holder of the mortgage with notice of the infirmities in the title. Upon that question the court, in section 6 of the syllabus, said:

"One who, on behalf of a loan company, takes an application for loans, which application is required to contain a detailed description of the property and the occupancy thereof, with the applicant's statement as to the condition of his title, which application, accompanied by an abstract showing the condition of the record concerning the title of the applicant to the property offered as security for the loan, is forwarded to the company, where the application and abstract is submitted to its attorney for an opinion as to the title of the applicant, and the necessary papers prepared and sent to the person taking the application to secure the execution thereof by the prospective borrower, is agent of the loan company, and notice of all knowledge acquired by him affecting the subject matter of the agency, while acting within the scope of his authority, will be imputed to the company."

The situation is very analogous to the

case at bar. It is to be remembered that John H. O'Rear, an officer of the oil company, testified that Mr. Hayden was in the company's land department and that Mr. Hayden "looked after the titles for the land department." Mr. Hayden did not examine the abstract, but submitted the same for examination to the company's attorney. Mr. Hayden had information sufficient to put him on inquiry, but the company attorney did not. So in the case of Langley v. Ford, the agent, Tarkington, had notice, but the company attorney, who examined the abstract, did not. The court held that Tarkington was such an agent that notice to him was notice to his company. We believe that case is authority for so holding as to Mr. Hayden and the oil company here.

When a corporation's agent, actively acting within the scope of his authority, acquires information concerning defects in a title about to be purchased by him for the company, the company is charged with notice received by the agent and knowledge of such facts as a reasonable inquiry would develop.

We are therefore of the opinion that at the time the oil company purchased the leasehold estate from Gragg and Graham, it had sufficient notice of infirmities in the title it was about to purchase to put it upon inquiry, and we must therefore charge it here with all such knowledge as a reasonable inquiry would develop.

Let us observe now what the facts were at that time concerning the condition of this title. The leasehold estate purchased by the oil company and involved in this action is an undivided ⅝th interest in an undivided 1/6th interest in an oil and gas lease covering lands in Seminole county. The entire 1/6th interest just specified belonged to certain minors. In May, 1928, these minors had a joint and common guardian of their estate and the guardianship proceedings were pending in the county court of Seminole county, where the minors resided. The lands had a prospective oil value. In accordance with the form of

the statutes applicable, the guardian, with the approval of the county court, executed a lease to one A. S. Norvell of Wewoka, as lessee. The sale was one in form and not in fact. A. S. Norvell, at the request of the guardian's attorney, bid on the lease the sum of $1,000 and received the lease and recorded the same. He did not intend to purchase the lease and did not claim to become the owner of the lease. He paid no money for the lease. He took it in his name solely as an accommodation for the attorney. This proceeding was had by agreement between the attorney and Mr. Norvell. The purpose was to get the title to the minors' leasehold estate in the name of an unrestricted adult so that he could thereafter convey the same for the benefit of the minors without the burden of court proceedings.

The evidence shows good faith and good intentions on the part of the attorney and A. S. Norvell and discloses that it was the intention of all parties involved in the transaction that A. S. Norvell should take the title of the leasehold estate as trustee for the benefit of the minors' estate. There is no law authorizing such a procedure. The conveyance to Norvell was a nullity.

In 28 C. J., column 2, page 1129, the author announces the rule of limitation upon the power of a guardian to delegate his duties. We refer to Robert Forsyth v. Robert K. Woods, Assignee, etc., et al., 11 Wall. 484, 20 L. Ed. 207. In that case was involved the power of the administrator of an estate. The case is clearly analogous to that of a guardianship. The question here considered was there discussed, and the court said:

"Letters of administration are a trust. They are granted by the probate court or ordinary because of confidence reposed in the grantee. They require him to take exclusive charge of the personal property of his intestate and to bring to its administration his own personal attention and judgment. He has no right to allow others to control it or to share in its administration. * * * It must be, therefore, that any contract which has for its object such a faithless abandon-

ment of the duties of an administrator cannot be enforced in a court of law."

We refer to In re Wood's Estate and Guardianship (Cal.) 114 P. 992. There the California court, announcing the rule for which we contend, said:

"The same principle was declared by the United States Supreme Court in Forsyth v. Woods, 11 Wall. 484, 487, 20 L. Ed. 207, where the court said: 'Letters of administration are a trust. They are granted by the probate court, or ordinary, because of confidence reposed in the grantee. They require him to take exclusive charge of the personal property of his intestate and to bring to its administration his own personal attention and judgment. He has no right to allow others to control it or to share in its administration. If he does, he exposes it to unnecessary hazards and subjects it to the disposition of persons in whom the officer of the law has reposed no confidence.' Such limitation on the control of the trust property by the trustee as is shown by the facts of this case has been considered at great length in at least two cases, and in each case the conclusion was reached that such a limitation was prohibited by this rule."

We refer to Fidelity & Deposit Co. v. Butler (Ga.) 60 S. E. 851. Here the court was dealing with a guardian of two minor children. He had entered into an agreement with a company becoming surety on his bond that the surety should have joint control with him over the funds of the estate. The right of the guardian so to do was an issue in the case. The opinion is lengthy and very analogous, going back into the English cases for its foundation. With approval the Georgia case quotes from an English case there cited in which the English court in relation to a receiver or a guardian said:

"Nor can he be permitted to put the fund intrusted to his care under their control, or the control of any person appointed by them, but must retain the complete control over it in himself, so as to be able to act with promptitude on any emergency. * * * Now, it is clearly the duty of the receiver, as an officer of the court, to keep in his own hands the control over the fund. * * * The surety's partner, George Anderson, was wholly unknown to the court, which reposed its confidence in its own officer, the receiver, and looked only to him. The acts of a stranger it had no power over, and could in no respect control or punish. * * * A receiver is the hand of the court, and no third person, whether surety or not, can be allowed to intervene between the order of the court and the act of the receiver. If the court gives direction about the control and management of funds, the receiver must promptly perform his duty and obey that direction. He cannot be required to ask the consent of any other person, or the concurrence of such person, in drawing out funds when the court so orders."

The law limiting the power of a receiver is no more stringent than the limitation upon the rights and powers of a guardian. Hence, we say the cases are analogous with the case at bar. Relative to the agreements made by the receiver with the surety, the court said that the power thus delegated to the surety "was palpably a veto power." The Georgia court held that such an agreement was contrary to public policy and therefore was a nullity. Further discussing the question, the Georgia court said:

"We are aware that public policy has been called 'an unruly horse,' and caution has been urged in mounting it. We agree that care and caution should be employed. But, if it be clearly ascertained, the rule of application is fixed by the law which declares that contracts against the policy of the law are not enforceable. Civ. Code 1895, sec. 3668. Persons occupying fiduciary positions are not always as careful and exact as they should be in dealing with the money or property of those whom they represent. It may be that restrictions and safeguards are sometimes, perhaps often, needed for the protection of children against waste or misuse of funds by well-meaning, though incompetent, guardians or trustees, or still more sometimes against knaves who would plunder the weak and helpless; but, if so, the establishment of such new safeguards is rather for the legislative than for the judicial department of the government. We can only declare the law as it is."

In consideration of the law as by the Georgia court announced, it is held that the guardian's delegation of power was unauthorized by law, was a nullity and unenforceable.

We have found no precedent or authority contrary to these holdings. It conclusively appears, therefore, that the guardian in the case at bar had no authority or power to convey in trust to A. S. Norvell a lease upon the minors' leasehold estate. This was an unauthorized delegation of power. The court of probate had no power or authority to approve such a transfer, and the court's order so approving the same is a nullity. The proceedings were void unless and until the minor, after attaining the age of majority and learning all the facts, should see fit to ratify the same. If he did ratify the conveyance in trust to Norvell, he could proceed then to require an accounting from the trustee to the cestuis que trust.

Although the proceeding placing title in Norvell in trust was not authorized by law, it appears that in good faith the parties intended to create a trust in Mr. Norvell. No corruption appears in the transaction.

In Pomeroy's Equity Jurisprudence, vol. 1, page 189, paragraph 155, the author says:

"They are of two species, 'resulting' and 'constructive,' which latter are sometimes called trusts ex maleficio; and both these species are properly described by the generic term 'implied trusts.' Resulting trusts arise where the legal estate is disposed of or acquired, not fraudulently or in the violation of any fiduciary duty, but the intent in theory of equity appears or is inferred or assumed from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go with the legal title. In such a case a trust 'results' in favor of the person for whom the equitable interest is thus assumed to have been intended, and whom equity deems to be the real owner. Constructive trusts are raised by equity for the purpose of working out rights and justice, where there was no intention of the party to create such a relation, and

often directly contrary to the intention of the one holding the legal title. All instances of constructive trust may be referred to what equity denominates fraud, either actual or constructive, including acts or omissions in violation of fiduciary obligations."

We think it conclusively appears, therefore, that A. S. Norvell was the trustee of a resultant trust and not of a trust ex maleficio, otherwise known as a constructive trust. The trust vested at the time the title to the lease passed to Norvell.

65 C. J. 371 states applicable rule:

"A resulting trust must result, if at all, the instant the title passes, and will not arise on other than the state of facts existing when the property is acquired. It cannot be created by subsequent occurrences." Botsford v. Burr, 2 Johns. Ch. (N. Y.) 405; McDevitt v. Frantz, 85 Va. 740, 8 S. E. 642, 647; Fox v. Fox, 56 N. D. 899, 219 N. W. 784; Justice v. Watkins, 276 Pa. 138, 119 Atl. 824.

After a creation of particular species of trust, the assignment of the estate will be held to be merely a substitution of a new trustee. Gerace v. Gerace (Mass.) 16 N. E. 2d 6, 9, 117 A.L.R. 1459.

No act of Norvell, the guardian, or the minors or the guardian's attorney, or of Gragg, Graham, or of the Superior Oil Corporation or of anyone else could have the effect of changing the nature of the trust created in Norvell in the first instance, to wit, that of a resultant trust. It may be important to ascertain and determine what duty rested upon A. S. Norvell when he became the trustee, holding the title to this leasehold estate and to know and to see what powers he possessed. We reassert that there is no authority of law for the conveyance of this leasehold estate to Norvell, in trust, as lessee. *This conveyance was an absolute nullity. When he received this lease he had one paramount duty and no power other than to discharge that duty. That duty was immediately to release this lease which he had received without authority of law, and that one power he had was to discharge that duty.* We will

458

have occasion later to refer to this limited power of the trustee. The guardianship in which this lease was executed was pending in the county court of Seminole county, where the judge of the court and the guardian could easily be interviewed. The attorney for the guardian lived in Wewoka. A. S. Norvell, trustee, was a prominent attorney and resident of Wewoka. The leasehold estate was located in that county and all records concerning the same were to be found in Wewoka. Had Mr. Hayden, as agent of the company, or had any other representative of the company desired to learn the facts, they could easily have been obtained. In the case of Gragg v. Freelan Pruitt, 179 Okla. 369, 65 P. 2d 994, this court considered a case involving most of the facts material here. We must conclude that a diligent or reasonable inquiry by the Superior Oil Corporation at the time it purchased the leasehold estate involved in this case would easily have disclosed the facts concerning the title hereinabove set out.

We have hereinbefore concluded that, while the burden of proof rested upon the oil company to plead and prove, by a preponderance of the evidence, that it was an innocent purchaser in due course for value, nevertheless, the plaintiff in the lower court assumed that burden. It made at least prima facie proof of the negative of the claims made by the oil company. Now let us observe the evidence produced by the oil company to overcome this prima facie proof. The oil company produced Mr. John H. O'Rear as a witness in its behalf. At the time this leasehold was purchased, he was an officer of the company. The whole purport of his testimony is that no one advised him that there were any infirmities in the title.

A. A. Davidson, attorney for the company, testified to representing the company in relation to the purchase of this leasehold estate and said that he never learned of any defects or infirmities in the title which the company was purchasing. This is about all the evidence produced by the company tending to show it was an innocent purchaser for value. The company did not produce Mr. Hayden to deny that he had received from various witnesses information which they testified they had given unto him. At the time of the trial Mr. Hayden was a resident in a county other than Seminole county, where the case was tried. So it appears from the testimony of the oil company's attorney, Mr. Bodovitz. His deposition could have been taken without great expense.

"Where it lies within the power of a party to an action to produce evidence upon an issue and he fails, the presumption follows that the evidence if produced would be unfavorable to the cause of such party." Moore v. Adams et al., 26 Okla. 48, 108 P. 392.

This rule is followed and elucidated in the following Oklahoma cases: Thompson v. Coker, 112 Okla. 268, 241 P. 486; Harrison et al. v. Reed et al., 154 Okla. 39, 6 P. 2d 700; Coats et al. v. Riley et al., 154 Okla. 291, 7 P. 2d 644; Saddler et al v. Watkins, 169 Okla. 279, 36 P. 2d 760.

Trial of this case was begun and continued from time to time, covering a long period of time. On an early day of the trial the company produced its attorney, Mr. F. O. Bodovitz, who testified in substance that some months previous Mr. Hayden had been discharged by the company. He testified that he had "seen him (Hayden) recently with regard to his knowledge of the case." Counsel for the oil company then propounded this question to him:

"State whether or not that was within the past very few days—too late to get a subpoena served on him to come here and testify?"

The witness answered in the affirmative. Thereupon appears these questions and answers:

"Q. State whether or not, at the time you saw him, if you requested Mr. Hayden to come here to testify as a witness? A. Yes, sir, I did; that is true. Q. State whether or not he refused to come, or what did he say? A. He refused to come. Q. State what he said with reference to

what he would do in the event his deposition was taken? * * * Q. Well, state whether or not he made an unreasonable demand? * * * A. Yes, he did. Q. As a condition upon which he would come here and testify in this case? A. Yes, sir. Q. Did you accept or refuse his demand? A. I refused."

He thereupon testified that the feeling of Mr. Hayden toward the company was hostile. The hearing of the case was adjourned from time to time for several months. The oil company had plenty of opportunity to take the deposition of the witness and it failed to do so. The showing is that he had hostile feeling toward the company, but we are not advised why he had that attitude. The witness said he made an unreasonable demand for the giving of the testimony. We are not advised of the facts and we know not what that demand was. The testimony shows the company desired to have his testimony and there is no showing that the witness would have testified falsely. The showing we believe is insufficient to overcome the presumption that his testimony would have been unfavorable to the company. His failure to testify, considered together with the unrefuted testimony of witnesses as to information they imparted to him, leaves the record weighing heavily against the oil company's contention that it was an innocent purchaser.

We refer to volume 4, Fletcher's Cyclopedia of Corporations, sec. 2231, where the author says:

"It is not necessary, in order to show knowledge of a corporation, to show knowledge by its board of directors; it is sufficient to show knowledge by any officer or agent obtained while performing business for the corporation within the scope of his authority. Moreover, of course, knowledge of agents who are not officials may be imputed to the corporation in the proper case."

The learned judge of the lower court believed that under the law and the evidence the Superior Oil Corporation was not an innocent purchaser in due course without notice and for value. His finding and judgment in that regard is not against the clear weight of the evidence, and we should not disturb his judgment to that effect.

The oil company says that, however and nevertheless, if it had made inquiry it would have been informed that A. S. Norvell took this lease in trust for the purpose of having the leased premises developed for oil. As we have heretofore stated, if the lease was given to Norvell in trust for such purpose, it was an absolute nullity because there is no law in this state by which the guardian of a minor's estate can turn over the administration of oil properties to a third party in trust and have such third party handle the estate and handle the development of premises for oil and gas. Charged with knowledge of the law, the oil company, if so informed, would know that such a lease was a nullity and by purchasing such a lease it would be substituted merely in lieu of Norvell as trustee, and the lease in its hands would yet remain a nullity.

Plaintiff below, defendant in error here, raises the question of a duty owed by a tenant to his cotenant. In January, 1929, certain adult persons owned an undivided 5/6ths interest in the leasehold estate involved herein. The remaining 1/6th is that particular 1/6th conveyed to A. S. Norvell in trust through guardianship proceedings. On January 4, 1929, the Superior Oil Corporation purchased from the adult heirs an undivided 5/8ths of the 5/6ths interest owned by the adult heirs. Thereby and on January 4, 1929, the oil company became the owner of an undivided 25/48ths of the entire leasehold estate. It is well to observe here that thereby the oil company had become the owner of more than an undivided ½ interest in the entire leasehold estate, thus giving it control thereof. It is also well to note here that the 1/6th interest conveyed through probate proceedings to A. S. Norvell, as trustee, had been by him conveyed in equal parts to Gragg and Graham. In the case of Gragg v. Freelan Pruitt, 179 Okla. 369, 65 P. 2d 994, this court held that Gragg and Graham at that time held the title to this

1/6th interest in trust for the benefit of the minors. In this opinion we have already held that the Superior Oil Corporation took its purchase rights charged with notice of the facts.

Two days after the oil company purchased and became the owner of more than an undivided ½ interest in this leasehold estate it had the transaction involved in this case. It was already obligated by contract with the adult owners to drill and operate the lease. Plaintiff says that this creates a mining partnership. At that time and on January 6th, it received an assignment from Gragg and Graham for 5/8ths of the 1/6th interest coming from the estate of the minors. It is for these reasons stated that plaintiff below, defendant in error here, invokes the rule of the duty of one tenant towards his cotenant. The owners of the minors' estate held by them in trust knew the facts and the Superior Oil Corporation was cotenant either with one or the other. So it is contended by the defendant in error here, plaintiff in the court below, that the Superior Oil Corporation, as a tenant, was chargeable with the knowledge of its cotenants and that knowledge was knowledge of all the facts in relation to the defects and infirmities in the title which the Superior Oil Corporation received by assignment from Gragg and Graham on January 6, 1929.

We are cited to the case of Nelson v. Lindsey, 179 Iowa, 862, 162 N. W. 3, where, in a somewhat similar situation the court said that the parties "were under mutual obligation of good faith, performance, and frank disclosure of all material facts." Having already held that for reasons stated the oil company is chargeable with notice, it is unnecessary to pass upon the question here stated.

It has been argued to this court by counsel for the oil company that it is unreasonable to believe that the oil company with notice of defects in the title it received from Gragg and Graham would have completed its contract and purchase of an undivided 5/8ths in the 1/6th interest coming from the minors' estate. This argument does not have strong appeal with us. Prior to January 6, 1929, when it received its assignment from Gragg and Graham, it had already become the owner of more than an undivided ½ interest in the entire leasehold estate and, by contract, had acquired control thereof. It acquired that majority interest from adult heirs under a contract to drill upon the lease at its own expense. Accordingly, when it concluded its purchase two days later from Gragg and Graham, it was already bound by contract to drill upon the leasehold estate. For this 5/8ths of the 1/6th interest coming from the minors' estate, it paid not a dollar and agreed to do nothing except that which it was already obligated by contract to do, to wit, drill upon the leasehold estate at its own expense. By taking the assignment from Gragg and Graham, it obligated itself to pay not a dime it was not already obligated to pay or to assume a burden which it did not already bear. In making this deal for the 5/8ths of the 1/6th coming from the minors' estate, it was playing a game of heads win but tails don't lose. If oil was produced by the drilling of this well, which it was already bound to drill, it would acquire the interest conveyed to it by Gragg and Graham without any further compensation. Under these conditions it could well afford to take a long chance on the validity of the title assigned to it by Gragg and Graham.

For one defense herein the oil company has pleaded ratification. Has it proved it? We first examine the applicable law. We refer to Capps et al. v. Hensley, 23 Okla. 311, 100 P. 515. The opinion is by Mr. Justice Dunn. In section 3 of the syllabus he says:

"'Ratification' and 'confirmation' appear to be considered as almost, if not quite, synonymous."

We refer to Thorp Oil & Specialty Co. v. Home Oil Refining Co., 79 Okla. 225, 192 P. 575. The opinion is by Mr. Justice McNeill. In section 2 of the syllabus the court says:

"* * * The general rule is, in order that a ratification of an unauthorized act or transaction of an agent may be valid and binding, it is essential that the principal have full knowledge of all material facts and circumstances relative to the unauthorized act or transaction."

The same language appears in section 4 of the syllabus in Horton et al. v. Fielder et al., 131 Okla. 101, 267 P. 847.

We refer to Riddle v. Ellis, 139 Okla. 68, 281 P. 286. In section 3 of the syllabus the court says:

"As a general rule, in order that a ratification of an unauthorized act or transaction of any agent may be valid and binding, it is essential that the principal have full knowledge, at the time of the ratification, of all material facts relative to the unauthorized transaction."

We believe the rule announced in Oklahoma is the general rule followed in all states.

In volume 7, Words and Phrases, First Series, page 5930, the author epitomizes the holding of the courts of many other states, among which are the following:

"Ratification is in the nature of a contract. It is the adoption of, and assent to be bound by, the act of another. There can be no ratification unless there is previous knowledge of all the facts and circumstances attending the act to be ratified. Herring v. Skaggs, 73 Ala. 446, 454, 455.

"Ratification presumes the existence of knowledge of all the facts, and one not informed of the whole transaction is not in a position to ratify the same. Hommel v. Meserole, 45 N. Y. Supp. 407, 409, 18 App. Div. 106; King v. Mackellar, 16 N. E. 201, 203, 109 N. Y. 215; Beck v. Donohue, 57 N. Y. Supp. 741, 742, 27 Misc. Rep. 230.

"Knowledge of all material facts and circumstances is an essential element to an effective ratification. Without such knowledge, the adoption of the acts of an unauthorized agent, or one who has exceeded his authority, will not bind the principal; but, on the contrary, if he has given his assent while in ignorance of the facts of the case, he may, on being informed, disapprove the unauthorized transaction. 1 Am. & Eng. Enc. Law (2d Ed.) 1189; Shull v. New Birdsall Co., 86 N. W. 654, 656, 15 S. D. 8."

We are reminded that on December 26, 1931, Freelan Pruitt became of age. The other minors were dead and, by inheritance, Freelan Pruitt had become the sole owner of an undivided 1/6th interest in the lands on which leases were given. Thereafter and on _____, Freelan Pruitt filed suit on behalf of himself and against Gragg and Graham. The decision of this court in that case is reported in 179 Okla. 369, 65 P. 2d 994. The oil company here says that thereafter Freelan Pruitt, as well as his executrix after his death, accepted from the Superior Oil Corporation royalties to the 1/8th royalty provided in the lease made to Norvell, as trustee, and by him assigned to Gragg and Graham and by them assigned, in part, to the Superior Oil Corporation. It is urged that the acceptance of the 1/8th royalty provided in the lease taken by the oil company by assignment from Gragg and Graham was inconsistent with the claims presented here that the oil company holds said lease merely in trust for the benefit of Freelan Pruitt and his heirs and legatees. The law seems to be well settled in this state that no act of the party charged with ratification can amount to a ratification unless at that time he had "full knowledge of all material facts and circumstances relative to the unauthorized act or transaction." "The act or transaction" which the oil company says was ratified is the act and transaction by which the oil company took from Gragg and Graham the assignment of an undivided 5/8ths of the 1/6th interest owned by Freelan Pruitt.

It is necessary that we observe just what knowledge Freelan Pruitt had when he brought the suit against Gragg and Graham. In that case he alleged that Norvell took the lease as the trustee of a resultant trust and that Gragg and Graham had taken assignments thereof from Norvell, and this they had done with full knowledge of the facts. He said, therefore, that Gragg and Graham were

trustees and he sought from them an accounting to him as the cestui que trust. The record shows no further knowledge in regard to the matter involved here other than as stated.

There is nothing in the record from which it can be said that Freelin Pruitt then knew or had any reason to believe that the Superior Oil Corporation was not an innocent purchaser or that it took the assignment with notice and knowledge of the facts. Freelan Pruitt had no cause of action against the Superior Oil Corporation except upon proof of this bad faith and knowledge of the Superior Oil Corporation. The burden of proof was upon the oil company to prove such knowledge on the part of Freelan Pruitt, and it has failed to sustain the burden.

The surrounding circumstances seem to indicate rather clearly that he had no such knowledge. Pruitt employed the attorney who evolved the trust theory on which recovery was had from Gragg and Graham. That is the same theory on which this suit proceeds. The attorney whom he employed brought suit against Gragg and Graham. Pruitt thereby indicated a willingness to litigate in the courts, having employed an attorney who more than likely would have brought suit against the Superior Oil Corporation if he had knowledge that the oil company was not an innocent purchaser and therefore he might recover against this company. The fact he brought the suit against Gragg and Graham and did not sue the Superior Oil Corporation at that time cannot be held to show knowledge that he then had a cause of action against the Superior Oil Corporation.

There are no circumstances in the case indicating that Freelan Pruitt had such knowledge. A young negro boy, living in Seminole county, apparently owning nothing but an undivided interest in lands not then valuable for oil, he drifted then from Seminole county. It appears that at times he lived in Tulsa and later in Coffeyville, Kan., where he died. His will was made in Coffeyville, Kan. There is nothing in the record indicating his degree of mentality or business acumen. The record does disclose several transactions had by Freelan Pruitt indicating lack of business experience and ability. How could Freelan Pruitt, living far from Seminole county, know that information showing the bad faith of the Superior Oil Corporation was possessed by the witnesses who testified in this record and who lived far from where Freelan Pruitt was then located? There is nothing in the record to show or to indicate that Freelan Pruitt had such knowledge up until the day when he filed this case against the oil company. We repeat that the burden was upon the oil company to prove, by a fair preponderance of the evidence, that Freelan Pruitt had knowledge of its bad faith, and it has failed to sustain that burden.

Freelan Pruitt received this royalty in pursuance of a division order. In the record we find only one division order signed by Freelan Pruitt. That was executed under date of February 14, 1933. It is addressed to the Tide Water Oil Company, which was purchasing the oil produced on the premises. It is in the usual form, reciting the interests owned by each one. It appears that at that time Mattie Wilson held the legal title of record to Freelan Pruitt's interest, she testifying in this case that she held it as a dry trust to protect Freelan Pruitt from being defrauded of his lands by some unscrupulous dealer. In said division order it is recited:

"It is understood that the execution of this division order shall not affect in any way any right or claim which Freeland Pruitt or Mattie Wilson, Trustee, may have against any of the parties having or claiming an interest in any of the property herein described, or moneys derived therefrom."

In the record appears another division order executed on March 10, 1936, after the death of Freelan Pruitt. It was executed by the administrators of the Freelan Pruitt estate. In that division order appears this language:

"The signing of this division order or accepting benefits hereunder by Mattie Wilson, as administratrix, shall in no way affect the pending litigation between Mattie Wilson, or Mattie Wilson, as administratrix, and the Superior Oil Corporation."

Accepting royalties from the company under the protection of the reservation stated does not amount to a ratification.

It does not appear that by reason of the acceptance of royalties by Freelan Pruitt the company changed its position to its detriment or in any manner suffered damage therefrom.

The plaintiff below, defendant in error here, urges other facts which it is claimed prevent the acts in question from amounting to a ratification. In this suit the plaintiff admits that the oil company at all times held the legal title of record to the interests involved here. The plaintiff has never denied the company holding this legal title. It is urged that therefore the acceptance of royalties which in any event would be due to Freelan Pruitt was not inconsistent with the plaintiff's claim that legal title was held by the oil company. For reasons aforesaid we have determined that no ratification is proven. We are satisfied with that conclusion, and therefore deem it unnecessary to further discuss the plaintiff's contention last above set out.

There can be no estoppel in this case. We refer to B. F. C. Morris Co. v. Mason, 171 Okla. 589, 39 P. 2d 1. In section 3 of the syllabus the court says:

"Wide difference exists between doctrine of 'ratification' and doctrine of 'estoppel,' the former being based on fact of intention to carry out terms of certain agreement, while latter is based on right of party to deny existence of such agreement by reason of his misleading acts."

Having held that the oil company has failed to prove by a preponderance of the evidence that it was an innocent purchaser for value without notice, and having held that the company has failed to thus prove its defense of ratification, we should turn to consider the other issues in the case.

This action is maintained by Mattie Wilson in her capacity as executrix of the last will and testament of Freelan Pruitt, deceased. The oil company claims that she is not the proper party plaintiff in this case. Supporting this contention it has introduced in evidence a written agreement whereby Freelan Pruitt, before his death, agreed to convey his interest in this leasehold estate to another upon demand. The record does not disclose any such demand and neither is it made to appear that this party desires such conveyance at this time. He may have waived this claim. In any event, this equitable claim would not preclude Freelan Pruitt from having maintained this action. If this party has any claim to these interests, it is an equitable claim and can be asserted upon distribution of Freelan Pruitt's estate in the county court.

In the record it appears that Mattie Wilson has conveyed interests to others. If she attempted thus to do in her capacity as executrix, the instruments are nullities because unauthorized by the court of probate. If thereby she merely conveyed interests acquired by her as a legatee under the will, such conveyances are immaterial for consideration here. The executrix is entitled to recover everything of value owned by Freelan Pruitt when he died, and those holding assignments or conveyances from heirs or legatees can be taken care of in the final distribution of Freelan Pruitt's estate. We believe, therefore, that the plaintiff is entitled to recover from the oil company in this case and that we should proceed to determine the amount for which she should be given judgment.

RILEY, J., concurs.